664 So.2d 115 (1995)
Walter E. BLESSEY, Jr. and Robert S. Reich
v.
Kelly McHUGH.
No. 94 CA 0555.
Court of Appeal of Louisiana, First Circuit.
July 27, 1995.
*116 Robert S. Reich, Terriberry, Carroll & Yancey, New Orleans, for plaintiffs-appellants Walter E. Blessey, Jr. and Robert S. Reich.
Richard L. Muller, Muller & Pastuszek, Mandeville, for defendant-appellee, Kelly McHugh.
Before GONZALES, PARRO and REDMANN,[1] JJ.
PARRO, Judge.
This is a suit for declaratory judgment and injunctive relief filed by Walter E. Blessey, Jr. ("Blessey") and Robert S. Reich ("Reich") against Kelly J. McHugh ("McHugh") seeking a declaration that the designation of a minimum building setback on a survey map, converting two lots in a subdivision into a single lot, created a valid and binding predial servitude. Reasoning that no predial servitude was established by the attachment of the resubdivision survey map to an act of cash sale, the trial court granted a motion for summary judgment in favor of McHugh from which Blessey and Reich appeal. For the reasons stated below, we affirm.

FACTS
Beau Chêne, Inc., as record owner of property in St. Tammany Parish, Louisiana, developed a community known as Beau Chêne. In conjunction with its efforts to subdivide this property, Beau Chêne, Inc. executed an "Act of Dedication of Servitudes, Privileges and Restrictions" ("Act of Dedication") on April 15, 1974 and recorded it with the clerk of court of St. Tammany Parish in April, 1974. The purpose of this dedication was "to provide for the preservation of the values and amenities in said community and for the maintenance of certain roadways, open spaces and other community facilities to be developed as a part of said community ... for the benefit of said property and the subsequent owners thereof`[.]"
To promote these goals, the Act of Dedication created The Beau Chêne Homeowners Association, Inc. ("the Association"), which *117 was made up of all property owners of record. The Act of Dedication, in article VII, section 6, authorized the Association's board of directors to create the Environmental Control Committee ("the Committee"), which would be capable of adopting and promulgating "such rules and regulations regarding the form and content of plans and specifications to be submitted for approval and may publish and/or record such statements of policy, standards, guidelines and/or establish such criteria relative to architectural styles or details, lot coverage, building set-backs, minimum square footage of the finished area of improvements, materials, or other matters, as it may consider necessary or appropriate." (Emphasis added.) Moreover, "[n]o such rules, regulations, statements, criteria or the like [established by the Committee] shall be construed as a waiver" of any provision or requirement of the Act of Dedication.
Regarding a lot owner's freedom to revise his subdivision lot, article VIII, section 1(f) of the Act of Dedication provided:
No lot shall be divided or subdivided and no portion of any lot (other than the entire lot) shall be transferred or conveyed for any purpose, except in those instances where the Environmental Control Committee approves a subdivision or revision in lot size which does not result in the diminution of the original sizes as shown on plat of Section 1 of the Beau Chêne Subdivision Plan.... The provisions of this paragraph shall not apply to parcels 1 through 10 of The Property.
Regarding the duration of servitudes, privileges, and restrictions set forth in the Act of Dedication, article XI, section 1, provided that "[t]he terms and provisions of this Act of Dedication, and any of the servitudes, privileges or restrictions herein contained, may be modified in whole or in part, terminated or waived ... by an Act of Modification, Termination or Waiver signed by the then owners of a majority of the lots and duly recorded[.]"
In 1976, Beau Chêne, Inc. retained a land surveyor to survey a tract of land owned by it in St. Tammany Parish referred to as parcel 7 of Beau Chêne Subdivision, section 1. The survey was performed by Waldemar S. Nelson and Company, Inc., Engineers and Architects, and was dated August 17, 1976 ("the 1976 survey map"), and recorded with the clerk of court of St. Tammany Parish on April 5, 1977. This survey map clearly set forth 12 restrictive covenants to run with the title to these lots. The pertinent covenant in this case is as follows:
3. Front building setback will be not less than 40 feet from front property line, side building setback will be not less than 20 feet on corner lots (unless indicated otherwise) and not less than 20 feet on interior lots, rear building setback will not be less than 30 feet from each rear property line....
With respect to the subsequent development of parcel 7 of Beau Chêne Subdivision, Beau Chêne, Inc. executed a "Second Act of Modification and First Supplementary Act of Dedication of Servitudes, Privileges and Restrictions" ("Act of Modification") on September 30, 1976 and recorded it in October, 1976.[2] Article II of this act modified article VIII, section 1(f) of the Act of Dedication to read as follows:
No lot shall be divided or subdivided and no portion of any lot (other than the entire lot) shall be transferred or conveyed for any purpose; except in those instances where the Environmental Control Committee approves said subdivision or revision in lot size.... The provisions of this paragraph shall not apply to Parcels 1, 2, 4A, 5, 6, 8A, 8B-1, 8B-2, 8C, 9, 10, 11, 12, and 14 of The Property.
Of the lots in parcel 7, Walter E. Blessey, Jr. and his wife owned lots A, B, R, X-1, and X. Lots A, B, and R were acquired by the Blesseys on August 2, 1991. Reich owned lot C.
Approximately two months after acquiring lots A and B, the Blesseys obtained permission from the St. Tammany Parish Planning Commission, the Association, and the Committee to resubdivide lots A and B to form a single lot (lot A-1), and thereafter, sold lot A-1 to Bobby Hebert, Jr. and his wife on *118 October 15, 1991. This act of cash sale set forth the legal descriptions of lots A and B, pursuant to the 1976 survey map, to identify the land being purchased by the Heberts. An addendum to the cash sale also set forth the legal description in terms of the newly formed lot A-1, pursuant to the survey map prepared by Ray P. Anslem, Inc., Registered Land Surveyor, dated September 6, 1991 ("the 1991 survey map"). The act of cash sale made no mention of the restrictive covenants established by the Act of Dedication, Act of Modification, or the 1976 survey map. Nor did the act of cash sale make mention of the creation of any new restrictions. This act simply made a general reference to the 1991 survey map which was annexed thereto. This 1991 survey map (which depicted only lot A-1) delineated the following minimum building setbacks for this particular lot: 40 feet from the front (west) property line, 150 feet from the north property line, 30 feet from the south property line, and 30 feet from the rear property line.
Subsequently, in light of Mr. Hebert's job relocation, the Heberts placed their lot on the market for sale. Although Surveyor Kelly J. McHugh and his wife were interested in purchasing this lot, they desired to reconfigure lot A-1 into two separate lots, as originally laid out, for marketability purposes. In pursuit of his plan to obtain permission from the proper authorities to resubdivide this lot, McHugh's office (Kelly J. McHugh & Associates, Inc.) prepared a resubdivision map and plat dated February 2, 1993, revised February 9, 1993, which resubdivided lot A-1 into lots A-2 and B-2 ("the 1993 survey map"). This map set forth the building setbacks for lots A-2 and B-2 as follows: front40 feet, side20 feet, and rear30 feet.[3]
Regarding approval of his plan to resubdivide lot A-1, McHugh obtained permission from the St. Tammany Parish Planning Commission by unanimous vote on February 9, 1993. By letter of February 18, 1993, the
Association notified McHugh that the Committee had concluded that the resubdivision was in conformity with the original official subdivision plan and design concept for the area. The Association also felt that the resubdivision met all the master restrictions as well as the restrictions for the original subdivision of parcel 7.
Upon learning of McHugh's efforts to obtain permission to resubdivide lot A-1, Blessey had his attorney notify the Heberts and the McHughs of his intent to enforce the restrictions set forth in the 1991 survey map, which included the 150 foot setback line. In a letter to McHugh's attorney dated March 15, 1993, Blessey stated that "[t]he issue is the preservation of Oak trees that are hundreds of years old that would be needlessly destroyed" and that "[v]iews have nothing to do with the matter." Blessey also contacted the Association and the Committee to notify them of the possible consequences of the resubdivision with regard to the trees and the character of the subdivision.
In conjunction with this purchase, McHugh sought the advice of several attorneys, including Martha L. Jumonville. He was informed that he would not have a problem resubdividing lot A-1. In her title opinion rendered on April 1, 1993, Jumonville made no mention of any restrictions or servitudes that may have been created as a result of the 1991 sale and/or survey map. On April 1, 1993, the Heberts sold this property to the McHughs referencing the 1993 survey map.[4]

Procedural History
In light of their fears that the McHughs would begin construction and cut down the old oak trees on lot A-2, Blessey and Reich filed a petition for declaratory judgment and injunctive relief. Regarding their request for a declaratory judgment, Blessey and Reich sought recognition of the validity of the minimum building setbacks set forth on the 1991 survey map depicting lot A-1. Regarding their request for injunctive relief, *119 they sought to have a permanent injunction issued against McHugh which restrained, prohibited, and/or enjoined him or anyone else from destroying, cutting, or removing trees or taking further actions to construct a residence or building outside of the minimum building setbacks set forth on the 1991 survey map.
After filing his answer and a reconventional demand, McHugh filed a motion for summary judgment and argued that neither the act of cash sale between the Blesseys and the Heberts, nor the survey attached thereto, nor the two in combination, gave rise to the creation of building restrictions or a servitude of any type which made the setback lines, as shown on the 1991 survey map, permanent restrictions on the use of the property, or otherwise prohibited a resubdivision of the property back into two separate lots.
The trial court granted McHugh's motion for summary judgment based on its finding that the attachment of the 1991 survey map to the 1991 act of cash sale did not create a predial servitude and dismissed Blessey and Reich's suit reserving McHugh's right to proceed under his reconventional demand. From the judgment granting McHugh's motion, Blessey and Reich appeal and contend that the trial court erred in granting a summary judgment since there exist issues of fact.

Standard of Review
Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Schroeder v. Board of Supervisors, 591 So.2d 342, 345 (La.1991). A motion for summary judgment is properly granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact, and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(B). Once the mover shows that evidence establishes that there is no genuine issue of material fact, the adverse party may not rest on the mere allegations or denials of his pleadings, but his response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial. LSA-C.C.P. art. 967.

Discussion
The key issue in this case relates to the procedure for termination of particular building restrictions established by the developer with respect to lots in a subdivision as a prerequisite to the imposition of new restrictions by a successor in title to the developer regarding one or more of the affected lots.
In connection with an effort to subdivide a parcel of land, a landowner may unilaterally execute an agreement designed to restrict the use of his property. Those charges imposed by the owner of an immovable in pursuance of a general plan governing building standards, specified uses, and improvements are called building restrictions. LSA-C.C. art. 775. The general plan must be feasible and capable of being preserved. Id. Building restrictions may be established only by a juridical act executed by the owner of an immovable or by all the owners of the affected immovables. LSA-C.C. art. 776. In order to be effective against third persons, instruments establishing restrictions must be filed for registry in the conveyance records of the parish in which the immovable property is located. A.N. Yiannopoulos, Predial Servitudes § 193, at 507, in 4 Louisiana Civil Law Treatise (1983).
Building restrictions are incorporeal immovables and sui generis real rights likened to predial servitudes.[5] LSA-C.C. art. 777. As real rights, building restriction clauses are not rights that are personal to the vendor. Oakbrook Civic Association, Inc. v. Sonnier, 481 So.2d 1008, 1010 (La. 1986). Rather, they inure to the benefit of all other property owners under a general plan of development, and are real rights running with the land. Id. Once they are recorded in the public records, a subsequent *120 acquirer of immovable property burdened with such restrictions is bound by them. Yiannopoulos, Predial Servitudes§ 193 at 507. The restrictions need not appear in the act by which the present owner acquired the property nor in his chain of title. Id. It suffices that the document establishing the restrictions was filed for registry in some form at the time the original subdivider conveyed the property to the ancestor of the present owner. Id. at 508-509.
It is not disputed that the Act of Dedication, the Act of Modification, and the 1976 survey map created building restrictions that were applicable to all lots located in parcel 7 of the Beau Chêne Subdivision. The required recordation of those documents which formed a general plan of development made their contents effective as to all prospective purchasers. Thus, it is clear that originally lots A and B were burdened by these restrictions and the purchaser of each of these lots would be bound by all building restrictions, including the building setbacks established by the 1976 survey map and the restriction against dividing or subdividing lots found in article VIII, section 1(f) of the Act of Dedication as amended by article II of the Act of Modification.
The building restrictions in this case were initially created by juridical act by Beau Chêne, Inc. The words of a contract are to be given their generally prevailing meaning. LSA-C.C. art. 2047; Prien Oaks Homeowners Association, Inc. v. Mocklin, 560 So.2d 115, 117 (La.App. 3rd Cir.1990); Oakbrook Civic Association, Inc. v. Sonnier, 481 So.2d at 1011. Since the rules governing building restrictions differ in certain particulars from the rules governing predial servitudes, question may arise as to the precise nature of the rights created by the agreement. LSA-C.C. art. 776, Comment (b). This is a matter of contractual interpretation, resolved in light of the facts of each case in accordance with the intention of the parties to the agreement. Id. However, when there is doubt as to the existence, validity, or extent of building restrictions, the matter should be resolved in favor of unrestricted use of the immovable. LSA-C.C. art. 783. This provision is harmonious with the public policy concern that property not be unduly encumbered or taken out of commerce.
Thus, we must determine whether the original building setbacks as established by the 1976 survey map were terminated or modified in such a way by the 1991 act of cash sale and attached survey map so as to be binding on all successors in title. Building restrictions terminate as provided in the act that establishes them. LSA-C.C. art. 780. Persons imposing building restrictions are free to prescribe rules for termination, provided, of course, that these rules are not contrary to the public order. Yiannopoulos, Predial Servitudes § 193 at 508. Therefore, provision may be made for termination of the restrictions upon the lapse of a period of time or upon the happening of an event; moreover, provision may be made for termination of the restrictions by agreement among the landowners in whose favor the restrictions were imposed and for the procedures by which this consent is to be obtained. LSA-C.C. art. 780, Comment (b). In the absence of a provision governing termination, resort can be made to LSA-C.C. art. 780, if applicable.
In this case, the Act of Dedication made provision in article XI, section 1 for the termination, modification or waiver of any servitudes, privileges or restrictions. This provision required an "Act of Modification, Termination or Waiver signed by the then owners of a majority of the lots and duly recorded[.]" There is no evidence in the record that Blessey had such an act prepared and executed by the appropriate parties in conjunction with his efforts to resubdivide lots A and B to form a single lot and to establish different building setbacks with respect to this new lot. Therefore, this court finds that Blessey has not shown that he sufficiently complied with the terms of the Act of Dedication enabling him to obtain a permanent modification or termination of the restrictions set forth in the 1976 survey map pertaining to building setbacks for the property in question.[6]

*121 Appropriateness of the Summary Judgment

In entering its judgment, the trial court was charged with viewing the facts in evidence in a light most favorable to the adverse party, finding no genuine issues of material fact, and concluding that the mover was entitled to judgment as a matter of law. After a thorough review and evaluation of the record, this court is convinced that the motion for summary judgment was properly granted. We conclude that the minimum building setbacks contained in the survey map attached to the Blesseys' deed in and of itself did not create a predial servitude or building restriction that would be binding on this property in perpetuity. Accordingly, the trial court was correct in rejecting Blessey and Reich's demands and granting the summary judgment in favor of McHugh which effectively denied the validity of the minimum building setbacks set forth on the 1991 survey map depicting lot A-1.

Decree
For the foregoing reasons, the summary judgment of the trial court is affirmed at Blessey and Reich's costs.
AFFIRMED.
REDMANN, J. Pro Temp., concurs and assigns reasons.
REDMANN, J. pro tempore, concurring.
The owner of a single piece of property may grant a servitude in favor of other pieces, or in favor of persons, or perhaps dedicate the single piece to public use, and thereby limit future owners' freedom to build. The owner of a single piece cannot, however, place a building restriction upon it except by subdividing it into a number of pieces (or by joining with owners of neighboring pieces) and creating (and recording) "a general plan governing building standards, specified uses, and improvements" as required by Civ.Code art. 775. Only when there is a plurality of pieces benefitting from restrictions imposed on each other is it possible to have the servitude-like relationship of building restrictions, in which appropriate limitations on all lots benefit all lots.
Plaintiff Blessey's survey of one residential lot was therefore ineffective to create a building restriction, notwithstanding that it showed building setback lines including 150 feet on one side.[1] Nor did that survey indicate any obligation that a future owner not cut down trees, nor resubdivide the double lot into two.[2]
I concur in affirming the summary judgment.[3]
NOTES
[1] Judge William V. Redmann, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] No other act of modification, termination or waiver was introduced into evidence.
[3] These setbacks are similar to the setbacks that were established in the 1976 survey map.
[4] By letter dated August 6, 1993, the Association notified the McHughs that the plans and specifications submitted for the construction of a dwelling on lot A-2 had been approved by the Committee. Moreover, the deposition testimony of McHugh reveals that lot B-2 had been sold to Harry Crosby.
[5] Building restrictions are regulated by application of the rules governing predial servitudes only to the extent that their application is compatible with the nature of building restrictions. LSA-C.C. art. 777.
[6] Under our holding, the minimum building setbacks for original lots A and B are still in effect because obtaining permission to resubdivide does not satisfy the procedure for termination of a restriction as set forth in article XI, section 1 of the Act of Dedication.
[1] That survey's building lines did include some land that originally was setback from the abutting sides of the former two lots. But approval by the environmental control committee constituted new boundaries (and eliminated the former common side boundary). The original minimum setback restrictions would run from only those new boundaries. (To provide 150-foot setback, of course, satisfies a 20-foot minimum.) Similarly, new owner McHugh's subdivision of the lot into two lots different from the original two, because also approved by the environmental control committee, also provides new boundaries from which the exact same original setback distances apply (40' from front, 20' from side, and 30' from rear boundary lines.)
[2] I also decline to join in citing uncritically the unquestioning repetition by Professor Yiannopoulos (Predial Servitudes, § 193), whose erudition might lend it plausibility, of the "constructive notice" slogan about the Louisiana public records doctrine.

Actual notice can not make unrecorded land documents effective against third persons (they are "utterly null and void," R.S. 9:2756). McDuffie v. Walker, 125 La. 152, 51 So. 100 (1909). Constructive notice, therefore, is not a reasonable explanation of the effectiveness of recorded documents (and, in essence, is preposterous). A recorded land document is effective against a third person, and an unrecorded document is not. Notice is irrelevant. See this writer's "Louisiana Law of Recordation: Some Principles and Some Problems," 39 Tul.L.Rev. 491 (1965).
[3] Defendant did not answer the appeal to ask damages for frivolous appeal. See C.C.P. arts. 2133 and 2164. Defendant did, however, reconvene for his damages from being prevented from enjoying his $275,000 land purchase. (Blessey paid $206,000 for three lots on August 2, 1991. Two months later, on October 15, 1991, he sold two of them for $240,000 to defendant's vendor, who sold them for $275,000 to defendant on April 1, 1993.)

Defendant's damages, as well as his attorney's fees and expenses, were caused by this meritless lawsuit by persons who, though one had bought the lot that had "numerous magnificent live oak trees" for about $69,000, were themselves unwilling to pay even that price to dedicate that lot to those trees. Instead, plaintiff Blessey joined another lot to it, put a 150-foot setback on it, and sold that treed lot in about two months for, proportionately, $120,000. And, when his buyer decided to sell a year and a half later, plaintiffs did not buy the $275,000 double lot or seek to buy only its treed half for half, or about $137,500. Yet they demand by unfounded lawsuit that the courts force defendant to forfeit not $69,000 or $120,000, but $137,500 of land to gratify theirwishes for trees.
The summary judgment of dismissal, and preservation of the reconvention, may dissuade others from comparable intermeddling.